IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

STEVEN A. METZLER ）
and DONNA L. METZLER, ）
）
      Plaintiffs, ）  TC-MD 110253N
）
  v. ）
）
YAMHILL COUNTY ASSESSOR, ）
）
）
      Defendant. ）  **DECISION**

Plaintiffs appeals the real market value of property identified as Account 7931 (subject property) for the 2010-11 tax year. A trial was held on September 1, 2011, in the Tax Courtroom, Salem, Oregon. Steven A. Metzler (Metzler) appeared and testified on behalf of Plaintiffs. Ron Woodard (Woodard), licensed appraiser, testified on behalf of Plaintiffs. Chris Lanegan (Lanegan), Registered Appraiser Analyst I, appeared and testified on behalf of Defendant. Brad Erland (Erland), registered appraiser, also testified on behalf of Defendant. Plaintiffs' Exhibits B 1A, B 2A, B 3A, B 4A, B 5A, and B 6A were offered and received without objection. Defendant's Exhibits A, B, and C were offered and received without objection.

## I. STATEMENT OF FACTS

The subject property is located in Gaston, Oregon and includes a single-family dwelling and a shop with a living area. (Def's Ex A at 3-4, 6.) The dwelling "was built in 1992 and is a two-story single family residence with a finished daylight basement." (Def's Ex A at 6.) Defendant's appraisers found the subject property condition to be "below average for its age[,]" noting that at the time of appraisal, it "was 18 years old and regular maintenance had not been performed." (*Id.*) The "detached shop was built in 2002 [and is] of similar quality as the main

DECISION TC-MD 110253N          1

house." (Def's Ex A at 6.) The shop is two stories, consisting of a "1[,]152 square foot shop, 800 square foot RV garage, 728 square feet of storage, and a half bath[]" on the first floor and "a finished living area, complete with a full bath, dining room, living room, and a kitchenette[]" on the second level. (*Id.*) Woodard testified that the subject property has a "territorial view," not a mountain view.

A. *Valuation History and Deferred Maintenance*

Metzler testified that Defendant originally determined a 2010-11 real market value of approximately $1.3 million for the subject property. He testified that he requested review of the subject property's real market value and, on November 17, 2010, Defendant reduced the real market value to $898,500. (Ptfs' Ex B 1A at 1.) Metzler testified that he requested a re-review and, on December 28, 2010, Defendant reduced the real market value to $598,900. (*Id.* at 2.) He testified that, at the Board of Property Tax Appeals (BOPTA) hearing in March 2011, Defendant recommended a real market value of $550,000. (Ptfs' Ex B 3A at 1.) Metzler testified that Defendant's recommendation to BOPTA included cost to cure estimates totaling $18,532.10, but did not account for mold or the poor condition of the deck. (*Id.* at 7.)

Erland testified that he completed a "desk review" or "desk appraisal" of the subject property without a site inspection in November 2010. Lanegan testified that Plaintiffs did not provide information concerning deferred maintenance at the time of their review request in November 2010. Lanegan testified that Defendant reduced the value of the subject property in December 2010, following receipt of the appraisal by Mandy McLaughlin (McLaughlin). (*See* Def's Ex B.) He testified that he and Erland completed a full inspection of the subject property on February 4, 2011; at that time, Plaintiffs had not provided any cost estimates for the deferred maintenance. Lanegan testified that, prior to the February 2011 site inspection, all of

Defendant's information concerning the subject property was based on a prior exterior inspection. Following the February 2011 inspection, Defendant's appraiser made the following changes, "The class was lowered from a class 5 to a class 4, the total square footage was increased by 159 square feet, the value placed on the view was lowered, and the % good was lowered to reflect the deferred maintenance." (Def's Ex A at 7.)

Plaintiffs estimate that it will cost $96,817.78 "to bring house up to standards," not including $4,500 to $5,000 for "painting of siding and trim, doors, [and] drywall repairs." (Ptfs' Ex B 5A at 2.) Metzler testified that necessary repairs include removal and replacement of siding, replacement of the inadequate heating system, replacement of 28 windows, repair of drywall in bedrooms, removal and replacement of deck, repair of porch and steps, and replacement of doors. (Ptfs' Ex B 4A at 1, 3-8.) Metzler testified that, as of the trial date, none of the repairs had been completed or even started because they are too expensive. Lanegan testified that "deferred maintenance need[s] to be addressed," but questioned whether all of the "repairs" identified by Plaintiffs are in fact repairs rather than "upgrades." (*See* Def's Ex A at 6.) Lanegan testified that the cost of upgrades are not taken into account as deferred maintenance and that the cost of a repair does not necessarily equate to value.

B.    *Plaintiffs' Appraisal*

Woodard inspected the subject property and determined the real market value as of January 1, 2010, to be $430,000, rounded.[1] (Ptfs' Ex B 6A at 2.) Woodard testified that he used the market approach, found five comparables sales from the subject property's "marketing area," and made adjustments for differences. (*Id.* at 4.) Woodard testified that the subject property's

---

[1] Woodard testified that his certification as a licensed appraiser does not allow him to appraise homes over $1 million in value and limits his ability to appraise "complex properties." Defendant suggested that the subject property is a "complex property" and that Woodard does not, therefore, have the necessary credentials to appraise it. Woodard testified that he disagrees that the subject property is a "complex" property.

market area includes Newberg, but that Newberg is nicer and more desirable than Gaston. He testified that the properties located on Bald Peak Road (sales 3 and 4) are also in a nicer area than the subject property. (*Id.* at 4-5.) Woodard made location adjustments ranging from, approximately, -$25,000 to -$41,000 to sales 2, 3, and 4.[2] (*See id.* at 4-5.) He testified that he had to consider sales in better market areas due to the limited number of sales available.

Woodard testified that the subject property is typical of the area, but its condition is not. Woodard determined all of his sales to be "superior" in condition to the subject property, requiring downward adjustments ranging from -$15,000 to -$57,000. (Ptfs' Ex B 6A at 4-5.) He testified that, in 2009 and 2010, the prices of rural properties were not falling as fast as "in-town" properties; for that reason, he did not make time adjustments. Woodard testified that the actual age of the subject property is 18 years, but he determined the effective age to be 20 years. (*Id.* at 4.) He testified that the subject property is two-stories with a daylight basement, but he did not include the daylight basement as above-grade square footage based on the Fannie Mae standard.

Woodard determined the adjusted prices of comparable sales 1 through 5 to be $429,180, $461,410, $392,705,$350,000[3] and $433,400, respectively. (Ptfs' Ex B 6A at 4-5.) He testified that he assigned a "weighted value" to each of his comparable sales ("wv3" is better than "wv1") and multiplied the adjusted sales prices by the weighed values. (*Id*. at 4.) He then averaged those values to determine a value for the subject property. Woodard testified that sales 1 and 5

---

[2] Woodard's report does not state the location adjustment for comparable sale 4. (Ptfs' Ex B 6A at 5.) However, Woodard testified at trial that sale 4 is located across the street from sale 3 and should have been adjusted similarly for location, estimating a downward adjustment of $26,000 or $27,000.

[3] During trial, Woodard corrected his location and effective age adjustments to sale 4 and revised his adjusted sale prices to approximately $350,000. Woodard testified that sales 3 and 4 are located across the street from each other and both feature views superior to that of the subject property. He testified that sale 4 offers views of Mt. Hood and other mountains to the east, and the house is set up to take advantage of those views; he made an adjustment of -$40,000. Woodard testified that sale 3 has some views of the coastal range; he made an adjustment of -$15,000. Woodard testified that he verified sale 4 with the title company and was told that it was not a short sale. Lanegan testified that he disagrees; the Regional Multiple Listing Service reported sale 4 as a short sale.

are the best comparable sales for the subject property; his adjusted sale prices were $429,180 and $433,400, respectively. He testified that he verified sale 1 with the buyers, the sellers, and through county records. Woodard testified that the sale 1 lot is over four acres, but the usable real acreage is less. The $15,000 lot adjustment was based on both the net usable acreage and the site.

C.     *Defendant's Appraisal*

Lanegan testified that, following their February 2011 inspection, he and Erland completed a summary appraisal of the subject property as of January 1, 2010. (*See* Def's Ex A.) He testified that they assumed the February 2011 condition of the subject property was also the condition in January 1, 2010. Defendant's appraisers used the sales comparison and cost approaches.

Lanegan testified that, for the sales comparison approach, he identified four comparable sales and one comparable listing, each of which Lanegan confirmed through Defendant's data analyst, or through Washington County's data analysis for sales in Washington County. (*See* Def's Ex A at 13-14.) Lanegan testified that due to the lack of sales near the subject property, he looked for sales in a wider area. He testified that he made time adjustments as well as an adjustment for "listing price to selling price ratio" for listing 5.[4] (Def's Ex A at 14.) Lanegan testified that sale 1 is newer and in better condition than the subject property, so he adjusted the sale price downward. Lanegan testified that he did not make location adjustments because there were no vacant land sales to provide a basis for the adjustment. Defendant's appraisers placed the most weight on sales 1 and 3 because they are "located closest in proximity to the subject" property; the adjusted sale prices of sales 1 and 3 were $515,600 and $492,400,

---

[4] Defendant's comparable listing 5 sold on May 23, 2011, for $500,000. (Def's Ex C at 34-35.) The initial list price for listing 5 was $725,000. (Def's Ex A at 14.)

respectively. (*Id.*) Under the sales comparison approach, Defendant's appraisers concluded the property held a value of $515,000. (*Id.*)

Woodard questioned Lanegan's adjustment of $25,000 to sale 1 based on its "inferior" view; he stated that both sale 1 and the subject property have "territorial" views, so no adjustment is required. According to the Regional Multiple Listing Service (RMLS), Defendant's sale 2 has mountain views and a "[d]aylight basement [that] was used as [a] shop." (Def's Ex C at 16.) Lanegan testified on cross-examination that comparable sale 2 should be adjusted downward -$31,000 for the basement and -$25,000 for the view, for a revised adjusted sale price of $517,000.[5] According to the RMLS information provided by Defendant, sale 3 features "breathtaking [mountain] & valley views" and a "[v]iew from nearly every [room]." (*Id.* at 12.) Defendant's appraisers did not make an adjustment for the superior view of sale 3, but stated in their report that a -$25,000 adjustment is appropriate for a superior view; this information suggests an adjusted sale price of $467,400 for sale 3. (Def's Ex A at 13, 21.)

Lanegan determined a value of $570,061 under the cost approach. ( Def's Ex A at 20.) Lanegan testified that his land value conclusion was based on the value set by BOPTA and is supported by McLaughlin's appraisal. He testified that his cost estimates are based on the Department of Revenue's cost factor book. Lanegan testified that he gave the most value to the sales comparison approach and determined a reconciled value of $515,000 for the subject property. (*Id.*)

D.    *McLaughlin Appraisal*

Defendant provided a copy of an appraisal of the subject property completed by McLaughlin. (Def's Ex B.) Lanegan testified that McLaughlin is a certified appraiser and that

---

[5] Defendant's appraisers originally concluded an adjusted sale price of $575,200 for sale 2. (Def's Ex A at 13.)

she determined a value under both the sales comparison and cost approaches. He testified that McLaughlin's values under the sales comparison approach ranged from $482,500 to $536,100; she concluded a value of $515,000. (*Id.* at 4-5.) McLaughlin was not available to testify at trial.

Woodard's sale 3 is the same as McLaughlin's sale 5. (Ptfs' Ex B 6A at 4; Def's Ex B at 5.) Woodard concluded an adjusted sale price of $392,705 whereas McLaughlin's adjusted sale price is stated as $508,600.[6] (*Id.*) Defendant's sale 1 is also McLaughlin's sale 6. (Def's Ex A at 13; Ex B at 5.) Defendant's appraiser determined an adjusted sale price of $515,600, whereas McLauglin's adjusted sale price is stated as $495,900. (*Id.*) Defendant's appraiser made an upward adjustment of $40,000 for "outbuildings" and an upward adjustment of $25,000 for "view" whereas McLaughlin did not make any adjustment for outbuildings or view. (*Id.*) The RMLS states that the property includes a "2+ stall horse barn" and a "252 [square foot] unfin[ished] '[t]heatre' room not included in total [square feet]." (Def's Ex C at 10.)

E.     *Requested Values*

The 2010-11 real market value and assessed value of the subject property is $530,000, as set by BOPTA. Plaintiffs request a 2010-11 real market value of $479,000. Defendant determined a 2010-11 real market value of $515,000 for the subject property and requests a reduction of the real market value to $515,000.

## II.  ANALYSIS

The issue before the court is the real market value of the subject property for the 2010-11 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real

---

[6] McLaughin's made an adjustment of $60,000 for "outbuildings." (Def's Ex B at 5.) Woodard testified that he did not make an adjustment to comparable sale 3 for an outbuilding because there is no outbuilding.

market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."[7]

The assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007; ORS 308.210.

Plaintiffs have the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.,* 18 OTR 324, 332 (2005) (citing *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

 "Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]" ORS 308.205(2). There are three methods of valuation that are used to determine real market value: 1) the cost approach, 2) the sales comparison approach, and 3) the income approach. *Allen v. Dept of Rev.*, 17 OTR 248, 252 (2003); *see also* OAR 150-308.205-(A)(2)(a) (stating that all three approaches must be considered, although all three approaches may not be applicable to the valuation of the subject property). The approach of valuation to be used is a question of fact to be determined on the

/ / /

---

[7] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

record. *Pacific Power and Light Co. v. Dept. of Rev.*, 286 Or 529, 533 (1979). Both parties considered comparable sales and neither party considered the income approach.

Defendant determined a value under the cost approach, but gave little weight to that approach. "The cost approach is 'particularly useful in valuing new or nearly new improvements.' " *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006). "The [cost] approach is especially persuasive when land value is well supported and the improvements are new or suffer only minor depreciation and, therefore, approximate the ideal improvement that is the highest and best use of the land as though vacant." Appraisal Institute, *The Appraisal of Real Estate* at 382 (13th Ed 2008). The subject property was 18 years old as of the January 1, 2010, assessment date with extensive deferred maintenance. The court finds that the cost approach does not provide a reliable indication of the real market value of the subject property in this case.

In determining the real market value of the subject property, the court focuses on the sales comparison approach. OAR 150-308.205-(A)(2)(c) states, in pertinent part,

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

"The court looks for arm's-length sale transactions of property similar in size, quality, age and location * * * in order to determine the [real market value]" of the subject property. *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *3 (Mar 26, 2003).

The court has reviewed both parties' appraisal reports and has heard the appraisers' testimony concerning the comparable sales selected and the adjustments made. The court finds that neither parties' sales comparison approach is entirely reliable, but each provides some persuasive information as to the real market value of the subject property as of January 1, 2010. Woodard made large downward adjustments (-$25,000 to -$41,000) for location to three of his

five comparable sales. He explained that the comparable sale properties were located in better market areas than the subject property, but could not identify his basis for the adjustments. Lanegan testified that he did not make location adjustments because he could not identify bare land sales from which to determine an appropriate adjustment. All of Woodard's comparable sales were "superior" in condition to the subject property, requiring downward adjustments; Woodard provided no sales that were comparable to subject property with respect to condition. Defendant's appraisers failed to make downward adjustments for the superior views of comparable sales 2 and 3. Defendant's appraisers' $25,000 adjustment for the "inferior view" of sale 1 is questionable given Woodard's testimony that the view is the same as the subject property.[8]

The court accepts the appraisers' testimony concerning their "best" comparable sales. Collectively, the parties' best comparable sales are Woodard's sales 1 and 5, with adjusted sale prices of $429,180 and $433,400, respectively, and Defendant's appraisers' sales 1 and 3, with adjusted sale prices of $515,600 and $492,400, respectively. Removing the $25,000 view adjustment to Defendant's sale 1 yields an adjusted sale price of $490,600. Adding a downward adjustment of -$25,000 to Defendant's sale 3 for its superior view yields an adjusted sale price of $467,400. Plaintiffs' requested real market value of $479,000 is supported by the comparable sales identified by the parties' appraisers. Accordingly, the court finds that the 2010-11 real market value of the subject property was $479,000.

### III. CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that the 2010-11 real market value of the subject property was $479,000. Now, therefore,

---

[8] Woodard's testimony is corroborated by McLaughlin's appraisal, which made no adjustment for the "view" of Defendant's sale 1.

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is granted. The 2010-11 real market value of property identified as Account 7931 was $479,000.

Dated this ____ day of December 2011.

_____
ALLISON R. BOOMER
MAGISTRATE PRO TEMPORE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Pro Tempore Allison R. Boomer on December 23, 2011. The Court filed and entered this document on December 23, 2011.*